A. E. LEVENSON and Marie Levenson,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

C. A. TILLMAN, Jr., and Harriet S. Tillman, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Halford Arthur TILLMAN and Virginia B. Tillman, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

A. Jesse DUKE and Martha M. Duke, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 8583, 8588, 8589, 8594.

United States District Court
N. D. Alabama, S. D.

Dec. 11, 1957.

each taxpayer [1] for a refund of income taxes for the year 1954. Common to each action is the mixed question of law and fact: Was Atomic Trailer Sales Agency, Inc., a collapsible corporation within the purview of Section 117(m) of the Revenue Act of 1939? 26 U.S.C.A. § 117(m).

On June 19, 1953, E. Y. McMorries and H. A. Tillman, as partners doing business under the firm name of Continental Supply Company, entered into a contract with the Robbins Trailer Corporation, to purchase some 3,996 trailers. Contemporaneously with the execution of such contract and in compliance with its terms, Robbins made available for delivery to the purchasers only 501 trailers; they were situated at Williston, South Carolina, and were vacant at the time of the execution of the contract.

E. Y. McMorries and H. A. Tillman associated themselves under an oral agreement with other individuals, including A. J. Duke, and proceeded to do business as a partnership under the name of Atomic Trailer Sales Agency. This latter partnership accepted delivery of the 501 trailers at Williston on or about July 1, 1953, and sold them all before July 29, 1953.

On July 29, 1953, a corporation was organized under the name of Atomic Trailer Sales Agency, Inc., the stock of which corporation consisted of $1,000, all of which was paid for in cash, and was owned by the following individuals in the proportions set opposite their respective names below:

| | |
|---|---|
| E. Y. McMorries | 25 |
| H. A. Tillman | 25 |
| Claude A. Tillman, Sr. | 15 |
| Claude A. Tillman, Jr. | 5 |
| Alfred E. Levenson | 20 |
| A. J. Duke | 8 |
| D. H. Markstein, Jr. | 2 |
| Total | 100 |

H. D. Markstein, Jr., Birmingham, Ala., for plaintiffs in cases Nos. 8583 and 8594.

Cuba, Cuba & McNatt, Atlanta, Ga., and Walter Mims, Birmingham, Ala., for plaintiffs in 8589 and 8588.

W. L. Longshore, U. S. Atty., and M. L. Tanner, Asst. U. S. Atty., Birmingham, Ala., and Charles Mehaffy, Atty. Tax Division, Dept. of Justice, Washington, D. C., for defendant.

LYNNE, Chief Judge.

Consolidated for purpose of trial only and, by agreement of the parties, tried to the court without the intervention of a jury, these four cases involve claims by

---

1. Wives were joined with husbands as parties plaintiffs because joint returns were filed for the year in question.

On August 10, 1953, a part of the stock of said corporation was transferred, and thereafter was owned as follows:

| | |
|---|---|
| E. Y. McMorries | 24 |
| H. A. Tillman | 19 |
| Claude A. Tillman, Sr. | 15 |
| Claude A. Tillman, Jr. | 10 |
| Alfred E. Levenson | 18 |
| A. J. Duke | 8 |
| D. M. Markstein, Jr. | 4 |
| Mrs. Bertha Behr | 2 |
| Total | 100 |

On July 30, 1953, Continental Supply Company executed an assignment of all rights of the partners in and under the basic contract between Continental Supply Company and Robbins Trailer Corporation to the new Corporation, Atomic Trailer Sales Agency, Inc.[2]

Thereupon, on the same date, the corporation entered into an agreement with C. A. Tillman, A. E. Levenson, E. Y. McMorries and H. A. Tillman, appointing them exclusive sales agents for the sales of the trailers involved.

At the time of the assignment of such contract to the corporation, there remained undelivered 3,495 trailers. As of that date Robbins Trailer Corporation had available for delivery only a part of the trailers at Barnwell, South Carolina. The corporation commenced to sell available trailers at Barnwell on or about August 3, 1953, and continued in this activity as Robbins made trailers available from time to time. Since such trailers could be made available for delivery to the corporation only when vacated by previous occupants, Robbins made available for delivery a part of the trailers at Augusta and at Aiken at irregular intervals. By February 15, 1954, the corporation had sold a total of 1,795 trailers and had realized a net profit of $417,471.81, and, on that date, had 109 trailers on hand unsold. Except as accounted for above, Robbins had not made available for delivery any other trailers to the corporation up to that date.

On February 15, 1954, each of the plaintiffs in these consolidated cases sold all of their stock in the corporation to a group composed of Ormond Somerville, Joseph L. Ullman, Jack M. Adler and Gene L. Fies, for $763,400. This new group, on February 19, 1954, caused the corporation to be dissolved and thereafter sold the remaining 1700 trailers as a partnership.

The oral testimony of witnesses leaves the court in no doubt that both before and after the organization of the corporation the entrepreneurs, finding themselves in possession of a most favorable contract, were seeking ways and means of converting ordinary income into capital gain. For example, after the corporation was organized efforts were made by the stockholders to find a "loss" corporation. Failing in this, negotiations were had with Pioneer Finance Company looking to its taking over the stock of the corporation just as the four named individuals finally did, with the stockholders of the corporation, or some of them, retaining control of the remainder of the operation.

After the sale of the stock and the dissolution of the corporation, two of the former stockholders continued the operation, McMorries staying on the job until at least sometime in July, 1954, and Tillman until October, 1954. Their methods of operations remained unchanged; their living expenses in South Carolina were paid, as were those of their wives; and their wives continued to perform the services theretofore rendered by them to the corporation and drew salaries therefor. However, neither of them was paid commissions on the sales of trailers concluded by them after February 15, 1954.

The purchase price of the stock in the corporation to be paid by the above-named four individuals was fixed in such a way by contract that it was flexible and was to be adjusted to the number of trailers made available to and sold by

2. Hereinafter referred to as the corporation.

the new partnership. Provision was made for revision downward of the purchase price if any of such trailers brought less than a stipulated amount. However, there was no provision for a revision upward upon the happening of any contingency.

To frame more accurately the respective contentions of the parties, the pertinent provisions of Section 117(m) (2) of the Revenue Act of 1939,[3] interpolating, where required, the appropriate provisions of Section 117(a) (1) (A) of such Act [4] are as follows:

"\* \* \* the term 'collapsible corporation' means a corporation formed or availed of principally for the \* \* \* purchase of property which (in the hands of the corporation) is stock in trade of the [corporation] or other property of a kind which would properly be included in the inventory of the [corporation] if on hand at the close of the taxable year, or property held by the [corporation] primarily for sale to customers in the ordinary course of [its] trade or business, with a view to—the sale or exchange of stock by its shareholders (whether in liquidation or otherwise) \* \* \* prior to the realization by the corporation \* \* \* purchasing the property of a substantial part of the net income to be derived from such property."

Plaintiff contends that the corporation was not "collapsible" for either one of two reasons, or both: *First,* the contract between the corporation and Robbins for the purchase of trailers, which was executory on the date of the stock sale, was a capital asset as negatively defined in Section 117(a) (1) [5] of the Revenue Act of 1939 and clearly was not one of the noncapital assets expressly defined in Section 117(a) (1) (A) thereof. *Second,* at the time of the sale of such stock, the corporation had realized a substantial part of the net income to be derived from the performance of such contract.

With equal confidence, defendant insists that such corporation meets the definition of Section 117(m) (2) of the Revenue Act of 1939 because: *First,* it was formed for the purchase and resale of trailers which (in the hands of such corporation) were not capital assets as defined by Section 117(a) (1). *Second,* a substantial part of the net income to be derived from such trailers had not been realized at the time of the sale of such stock.

Benefited by hindsight, defendant detects in the evolution from old partnership to corporation to new partnership a scheme confected with the subjective in-

---

3. 26 U.S.C.A. § 117(m) (2) (1939 as amended) reads as follows:

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such share-holders of gain attributable to such property."

4. 26 U.S.C.A. § 117(a) (1) (A) (1939 as amended) provides:

"Stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; \* \* \*."

5. 26 U.S.C.A. § 117(a) (1) (1939 as amended):

"(a) Definitions. As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—"

tent of thwarting it in the collection of its just revenue, and complains, with more than a little merit, that the sale of the stock of the corporation was in effect a contract of the four new individuals, for a fixed fee, to hold the assets of the corporation in their name while the income continued to be produced by former stockholders of the corporation.

■ To be perfectly candid, this court is not so naive as to suppose that a tax avoidance motive did not permeate the organization of the corporation and did not play a part in, indeed if it did not dictate, the time and the manner of the sale of the stock by its stockholders. It is too late in the day for the defendant to insist that its citizens are obliged to conduct their affairs and mold their businesses so as to produce for its treasury the maximum amount in taxes.[6]

Notwithstanding the temptation to use as a springboard the strong impression that the partners trading as Atomic Trailer Sales Agency, finding themselves in possession of an extremely advantageous contract, availed themselves of the corporation for the primary purpose of translating into capital gain what would otherwise have been ordinary income, this court has learned through long experience that the proper approach to the decision of a tax case is first to read the statute as the Congress has written it and then to apply the language of the statute to the facts of the case.

The legislative background of the collapsible corporation section is an interesting commentary on the continuing efforts of the Congress to plug up loopholes in the Revenue Act after their discovery of and use by ingenious taxpayers. As originally enacted in 1950, the collapsible section applied only to corporations that manufactured, constructed or produced property. It was clearly aimed at the motion picture industry and the building trade; it did not apply to purchased assets.[7] In 1951, however, the Congress was alerted to the enlarged scope of the problem. By amendment, to extend the coverage of the section to the liquor industry, the tobacco industry, the cheese industry, and any other industry whose inventory appreciated with age, Congress added to the definition of a collapsible corporation corporations "formed or availed of principally * * * for the purchase of property which (in the hands of the corporation) is" stock in trade, inventory or property held primarily for sale to customers in the ordinary course of business.[8]

Therefore, to determine the applicability of the collapsible section to the corporation here involved, the first step is to decide whether the corporation, at the time of the sale of its stock, held property as described in such section. The Treasury Department regulations[9] declare that this must be resolved before the

---

6. Friedlander Corp. v. Commissioner, 5 Cir., 1954, 216 F.2d 757; Kraft Foods Co. v. Commissioner, 2 Cir., 1956, 232 F.2d 118; United States v. Bondurant, 6 Cir., 1957, 245 F.2d 265.

7. S.Rep. No. 2375, 81st Cong., 2d Session, Calendar No. 23801 (1950).

8. S.Rep. No. 781, 82d Cong., 1st Session, Calendar No. 737 (1951).
 S.Rep. No. 781, part 2, 82d Cong., 1st Session, Calendar No. 737 (1951).
 Joint Committee Staff Summary of Provisions of the Revenue Act of 1951, as agreed to by the Conferees.

9. T.D.Reg. 118, Sec. 39.117(m) (b) (7) reads as follows:
 "In determining whether a corporation is a collapsible corporation by reason

of the purchase of property, it is immaterial whether the property is purchased from the shareholders of the corporation or from persons other than such shareholders. The property, however, must be property which, in the hands of the corporation, is property of a kind described in section 117(a) (1) (A). Section 117(a) (1) (A) describes the following property: Stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business. The determination whether property is of a kind described in section 117(a) (1) (A) shall

question of subjective intent becomes important.

The only property of the corporation at the time of the sale of such stock which could possibly be construed to be Section 117(m) assets were a contract to purchase the trailers from Robbins, together with the 109 trailers then on hand in inventory. Since 1795 trailers were sold by the corporation and only 109 remained on hand at the date of the sale of the stock, it is quite obvious that if the contract is not a Section 117(m) asset, the 70% rule of Section 117(m) (3) (B) [10] makes the collapsible section inapplicable. Adverting to the provisions of Section 117(a) (1) (A), interpolated by reference into the provisions of Section 117(m) (2) (A), one finds a non-exclusive definition of noncapital assets.

 It is conceded that if the contract to purchase trailers from Robbins was a capital asset, it could not be considered a Section 117(m) asset. Except as to the trailers in inventory on the critical date, it is clear that such contract was executory. The courts have consistently held, and this court agrees, that an executory contract is a capital asset.[11]

If this were not enough, it may easily be demonstrated that the contract in question was not such a noncapital asset as is described particularly in Section 117(a) (1) (A). The defendant has conceded here that such contract was not stock in trade of the corporation and was not itself held by the corporation primarily for sale to customers in the ordinary course of its trade or business. But defendant has argued that the real business of the corporation was the purchase and resale for profit of trailers. Therefore, it is contended, the remaining 1700 trailers were property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year.

 With that insistence this court cannot at all agree. A consideration of the provisions of paragraphs 2, 3, 4, 5, 6 and 10 of the contract with Robbins compels the conclusion that title to the remaining 1700 trailers had not passed to the corporation as of the date of the sale of its stock. It is the opinion of the court that property described in a contract to purchase is not properly includable in the inventory of the purchaser until title has passed.[12]

 If the court is in error in the firm opinion that the undelivered trailers, title to which had not passed to the corporation, were not Section 117(m) assets of the corporation on February 15, 1954, nevertheless plaintiffs would be entitled to recover because, prior to the date of the sale of the corporate stock, the corporation had realized a substantial part of the net income to be derived from the trailers described in such contract.

When the corporation was organized there remained available to it under the Robbins contract 3,495 trailers. As of February 15, 1954, the corporation had sold 1,795 trailers; 109 were on hand; and 1591 remained to be delivered. Assuming *arguendo* that 3,495 trailers constitute "the property", it is necessary to ascertain what is 100% of the taxable in-

be made without regard to the fact that the corporation is formed or availed of with a view to the action described in section 117(m) (2) (A)."

10. 26 U.S.C.A. § 117(m) (3) (B) (1939 as amended) provides:
"This subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; * * * "

11. Commissioner of Internal Revenue v. Covington, 5 Cir., 120 F.2d 768; United States v. Jones, 10 Cir., 194 F.2d 783; Commissioner of Internal Revenue v. Goff, 3 Cir., 212 F.2d 875; Elliott B. Smoak, 43 B.T.A. 907; The Pittston Co., 26 T.C. 967; Thomas E. Wood, 16 T.C. 213.

12. Haas Bros. v. McLaughlin, 9 Cir., 39 F. 2d 381; Barde Steel Products Corp. v. Commissioner, 2 Cir., 40 F.2d 412; Brown Lumber Co. v. Commissioner, 59 App.D.C. 110, 35 F.2d 880.

come from that property. The only feasible test is to add to the taxable income already realized the additional taxable income that would be realized by the corporation if it sold the collapsible property as of February 15, 1954.[13]

Considering the evidence relating to the sale by the new partnership of the remaining 1,700 trailers and the expenses, including commissions, properly allocable to such sales if made by the corporation, the court finds that 51.37% of the net income to be derived from the 3,495 trailers had been realized by the corporation by February 15, 1954, and that 48.63% of the net profit was unrealized on such date.

No definition of "substantial" appears in the collapsible section or elsewhere in the Revenue Act of 1939. Nor does the legislative history of Section 117(m) shed any light on its intended scope. Cases dealing with the meaning of this adjective in the context of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.,[14] the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.,[15] and the Bankruptcy Act, 11 U.S.C.A. § 1 et seq.,[16] afford little or no guidance.

It ill becomes this court to criticize the language employed by the Congress in drafting a Revenue Act. It is quite easy to observe after the event has occurred that in lieu of "substantial" the Congress might have employed a percentage to express its true meaning. However, this court has been impressed time and again more often with the excellence of legislative draftsmanship than with its deficiencies.

It is to be expected that the word "substantial" as used in the phrase "substantial part of the net income" will continue to be a cause of interpretive difficulty. Its counterpart is found in the Revenue Act of 1954 (26 U.S.C.A. § 341(b) (1) (A)) in the phrase "a substantial part of the taxable income." The regulations promulgated by the Treasury Department both under the 1939 Act as amended and under the 1954 Act go so far in one place as to suggest that until the yet unrealized income from property is insubstantial in relation to the income that has been realized, the realization may not be regarded as having been of a substantial part of the net [taxable] income.[17]

The authors of the article in the Columbia Law Review, to which reference has heretofore been made, state, "it is understood, however, that the realization of 50% of the taxable income from the property is regarded as substantial by the service for purposes of advance rulings by the national office. But since no published ruling exists to that effect, it would appear that each field official's view of what constitutes a substantial part may be made independently, based upon the circumstances of the particular case." [18]

It would appear that the problem is one for the Congress to resolve by amendment to provide a clear and adequate definition of its concept of "substantial." The disagreeable alternative is to leave the matter for definition by the courts and local tax officials on an ad hoc basis in each case.

Giving to the word "substantial" its ordinarily accepted meaning [19] it is in-

13. "Collapsible Corporations", Adrian W. DeWind and Robert Anthoine, Columbia Law Review, Vol. 56, No. 4, p. 475, at pages 490 and 492.

14. E. g., N. L. R. B. v. Cowell Portland Cement Co., 9 Cir., 108 F.2d 198.

15. E. g., Southern California Freight Lines v. McKeown, 9 Cir., 148 F.2d 890; Fleming v. Post, 2 Cir., 146 F.2d 441, 158 A.L.R. 1384; Skidmore v. John J. Casale, 2 Cir., 160 F.2d 527.

16. E. g., Schainman v. Dean, 9 Cir., 24 F.2d 475.

17. U.S.Treas.Reg. Sec. 1.341–5(c) (2) (T.D.6152) (1955).

18. Columbia Law Review, Vol. 56, No. 4, at page 489.

19. Webster's New International Dictionary gives "substantial" the following apposite definition: "Considerable in amount, value, or the like; large, as a substantial gain."

conceivable to this court that the realization of more than 50% of the net income from the property should not be regarded as substantial.

 The precise holding of the court that the executory contract with Robbins was not a Section 117(m) asset, and that, if it were, a substantial part of the net income to be derived from the performance of such contract had been realized by the corporation as of February 15, 1954, is dispositive of all four cases. However, if the court is mistaken in its ultimate conclusions, there remains an issue in the Duke case relating to the application of the limitation provisions of Section 117(m)(3)(A) of the Revenue Act of 1939.[20] Plaintiff, Duke, contends that at no time after the commencement of the purchase of the trailers by the corporation did he own or was to be considered as owning more than 10% in value of the outstanding stock of the corporation.

Since it was stipulated that plaintiff, Duke, never at any time owned more than 8% in value of the outstanding stock of the corporation, it was conceded by defendant in oral argument that the only basis for a determination that he was to be considered as owning more than 10% of such stock would be a finding that the old partnership, in which he owned more than a 10% interest, continued to perform the contract with Robbins after the organization of the corporation on July 29, 1953.

This issue is a short horse soon curried. The court finds that the partnership known as Atomic Trailer Sales Agency had completed its operations and was dissolved before the organization of the corporation on July 29, 1953.

Judgment will be entered in favor of the plaintiffs in each case in an amount to be agreed upon after recomputation by counsel for plaintiffs and the District Director of Internal Revenue for the District of Alabama.

**20.** 26 U.S.C.A. § 117(m) (3) (A) (1939 as amended) provides:

"This subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, or at the time of the purchase of the property described in subsection (a) (1) (A) or at any time thereafter, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation."